**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Gary Reed and Tom Vevea, as Trustees of the Minnesota Laborers Health and Welfare Fund and Minnesota Laborers Pension Fund; James Brady and Gary Reed, as Trustees of the Minnesota Laborers Vacation Fund; Gary Reed and John Bartz, as Trustee of the Construction Laborers' Education, Training, and Apprenticeship Fund of Minnesota and North Dakota; and Dan Olson and Chris Born, as Trustees of the Minnesota Laborers Employers Cooperation and Education Trust; and each of their successors, | Civil No. 12-89 (DWF/LIB) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Insituform Technologies, Inc., | |
| Defendant. | |

Amy L. Court, Esq., Carl S. Wosmek, Esq., and Christy E. Lawrie, Esq., McGrann Shea Carnival Straughn & Lamb, Chartered, counsel for Plaintiffs.

Kevin T. McLaughlin, Esq., and Molly R. Batsch, Esq., Greensfelder, Hemker & Gale, P.C.; and Martin S. Fallon, Esq., and Jason A. Lien, Esq., Maslon, Edelman, Borman & Brand, LLP, counsel for Defendant.

**INTRODUCTION**

This matter is before the Court on cross-motions for summary judgment.

Defendant, Insituform Technologies, Inc. ("Insituform" or "Defendant") moves for

summary judgment.  (Doc. No. 33.)  Plaintiffs, Gary Reed and Tom Vevea, as Trustees of the Minnesota Laborers Health and Welfare Fund and Minnesota Laborers Pension Fund; James Brady and Keith Kramer, as Trustees of the Minnesota Laborers Vacation Fund; Gary Reed, as Trustee of the Construction Laborers' Education, Training, and Apprenticeship Fund of Minnesota and North Dakota; and Dan Olson and Chris Born, as Trustees of the Minnesota Laborers Employers Cooperation and Education Trust; and each of their successors (together, "Plaintiffs") also move for summary judgment and have also filed an amended motion for summary judgment.  (Doc. Nos. 27 & 47).  Defendant has further moved to strike Plaintiffs' amended motion for Summary Judgment (Doc. No. 52) and Plaintiffs' reply memorandum (Doc. No. 57).  For the reasons set forth below, the Court denies Defendant's motion for summary judgment, grants in part and denies in part Plaintiffs' motion for summary judgment, and denies Defendant's two motions to strike.

## BACKGROUND

Plaintiffs are the trustees for certain fringe benefit funds (the "Funds").  Defendant is a Missouri corporation that specializes in the rehabilitation and protection of pipeline systems and does business in Minnesota.  (Doc. No. 38, Gouy Aff. ¶ 3.)  The fringe benefits at issue in this case are outlined in the collective bargaining agreements for "Minnesota Highway, Railroad and Heavy Construction in Minnesota" and are between relevant contractors and unions.  (Doc. No. 20, Lessard Aff. ¶ 2, Exs. A-D.)  There are two CBAs:  a 2005-2008 CBA (the "First CBA") and a 2008-2010 CBA (the "Second CBA") (collectively, the "CBAs" or the "Agreements").  (*Id.*)  Defendant executed the

First CBA on April 27, 2006, and the Second CBA on March 4, 2009. (Lessard Aff. ¶ 2, Exs. A-B.)

Under these CBAs, Defendant is obligated to pay fringe benefit contributions to the Funds as outlined in the Agreements. Article 22 of both CBAs is titled "Fringe Benefits" and outlines the parties' obligations with respect to fringe benefits. (Lessard Aff. ¶ 2, Exs. C, D.) Specifically, Article 22 provides for fringe benefits to be paid each month "for each hour worked by all Employees covered by this Agreement." (*Id.*) Article 22 also states that fringe benefit requirements apply to employees "REGARDLESS OF WHETHER OR NOT SUCH EMPLOYEES ARE MEMBERS OF THE UNION." (Lessard Aff. ¶ 2, Exs. C, D at § 5(i) (emphasis in original).) Article 22 of the Second CBA requires Defendant to "accurately report all hours worked by each Employee covered by this Agreement," and also requires the following:

> [That Defendant] maintain adequate records to identify the type of work being performed by its Employees to allow the Funds to determine whether the Employer is accurately reporting hours to the Funds. If the Employer fails to maintain satisfactory records from which the type of work being performed by an individual may reasonably be determined, the Employer will be held liable for all of the hours worked by that individual for whom the Employer is unable to produce satisfactory records verifying the type of work being performed by that individual.

(Lessard Aff. ¶ 2, Ex. D at §§ 2(a) & 5(g).) Under Article 22, "[t]he Employer shall maintain adequate records from which the Funds may determine whether Employees worked outside the scope of the Agreement," and "[t]here shall be no requirement that Employees sent to work outside the scope of this Agreement be paid fringes, nor shall the Employer be required to duplicate fringe contributions." (Lessard Aff. ¶ 2, Ex. D at § 4.)

3

In July 2011, the Trustees requested payroll and employment records from Defendant for an audit covering the time period of January 1, 2009 through June 30, 2011 ("Audit Period"). (Lessard Aff. ¶ 4, Ex. E.) In response to the request, on August 18, 2011, Defendant provided the following: W-2s for 2009 and 2010; historical payroll registers for Minnesota employees for the Audit Period; Federal 940s for 2009 and 2010; monthly remittance reports for the Audit Period; and Minnesota Unemployment Wage Report summaries for 2009, 2010, and first quarter 2011. (*Id.*; Doc. No. 37, Wall Aff. ¶¶ 3-5.) Minnesota Unemployment Wage Report summaries included total wages paid, but did not include individual employee hours. (Lessard Aff. ¶ 5.) No records included descriptions of the type of work performed. (Lessard Aff. ¶¶ 5-8 & Ex. G.)

After reviewing the above-documents, Plaintiffs' auditor concluded that Defendant had underreported hours for five employees for the Audit Period and sent a bill to Defendant. The employees for whom Plaintiffs allege Defendant underreported hours were initially hired by Defendant as Laborers and were then promoted to salaried supervisory positions at some time prior to or during the Audit Period. (*See* Doc. No. 31, Court Aff. ¶ 13, Exs. A-F.) Salaried supervisory positions are referred to by Defendant as "Superintendents." A Superintendent is typically a job-site supervisor and is tasked with ensuring project quality and completion. (Gouy Aff. ¶ 4.) Defendant generally performs its work with crews of approximately five or six crew members who travel to different job sites and who are supervised by and report to a Superintendent. (Gouy Aff. ¶¶ 3-5.) One employee, Charles Huesman, was further promoted to "General Superintendent" in January 2011. (Doc. No. 40, Huesman Aff. ¶¶ 7-8.) General

4

Superintendents oversee multiple crews and also have hiring and firing responsibilities. (Gouy Aff. ¶ 5.)

Specifically, the Trustees sought contributions for the following individuals and time periods: (1) Bruce White (promoted to Superintendent in May 2009) from June 2009 through December 2009; (2) Charles Huesman (promoted to Superintendent in August 2010) from August 2010 through June 2011; (3) Brandon Meyer[1] (promoted to Superintendent in January 2011) from March 2011 through June 2011, and August and September 2010; (4) Patrick Hillan (promoted to Superintendent in July 2010) from August 2010 through June 2011; and (5) Terry Fedder (promoted to Superintendent in November 2010) from November 2010 through June 2011. (Lessard Aff. ¶ 5, Ex. G; Wall Aff. ¶¶ 5-7, 10.)

It is not disputed that these employees performed work covered by the CBAs while they were Laborers and that Defendant did report hours and submit fringe benefit contributions for those employees. (*See* Court Aff. ¶ 13, Exs. A-F.) Defendant did not track and report hours for these employees once they became Superintendents or General Superintendents, believing they were statutorily exempt from contributions as supervisors. (Gouy Aff. ¶ 7.) The employees relevant to this case testified that, once they become Superintendents or General Superintendents, ten to fifty percent of their work involved the same types of work they had performed as Laborers. (*See* Court Aff. ¶ 13, Exs. A-F.) According to the Trustees, to identify the underreported hours for these

---

[1] The parties agree that some of Brandon Meyer's hours were tracked and that Defendant had paid contributions for those hours; those hours were subsequently removed from Plaintiffs' auditor's invoice.

5

five employees, the auditor compared total hours worked for all employees with hours reported to the Trustees.  (Lessard Aff. ¶ 6.)

In their Complaint, Plaintiffs assert the following claims under the Employee Retirement Income Security Act ("ERISA"):  (1) audit amount due; (2) right to audit; and (3) damages.  Both parties now move for summary judgment.  In their motion, Plaintiffs claim that they should be granted summary judgment because Defendant is required to submit contributions for all hours where all employees performed covered work per the CBAs at issue and, in fact, Plaintiffs are entitled to contributions for *all* hours worked by the five employees because Defendant failed to maintain adequate records.  Plaintiffs also argue they are entitled to penalties, costs, and attorney fees based on Defendant's failure to make said contributions.  In its motion, Defendant argues the contrary:  that it should be granted summary judgment because the employees at issue are excluded from the CBAs and from requirements for contributions because they are supervisors as defined by statute and that Plaintiffs are not entitled to a subsequent audit as a matter of law because they failed to follow the demand requirements outlined in the CBAs.[2]

## DISCUSSION

**I.    Summary Judgment Standard**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The

---

[2]    The parties do not appear to dispute that the employees at issue were supervisors, and there are also no claims relating to purposeful misclassification as is often alleged in such cases.

Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

**II.    Contributions for Work Performed by Superintendents and General Superintendents Under the CBAs**

Section 515 of ERISA governs claims of non-payment with respect to fund contributions. Section 515 is intended to simplify actions for delinquent contributions, avoid costly litigation, and facilitate the administration of multi-employer plans. *Cent. States Se. & Sw. Areas Pension Fund v. Indep. Fruit & Produce Co.*, 919 F.2d 1343, 1348 (8th Cir. 1990). Section 515 provides:

7

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions *in accordance with the terms and conditions of such plan or such agreement*.

29 U.S.C. § 1145 (emphasis added). To resolve these types of claims, the Court looks to the terms of the CBA to determine what the "terms and conditions of such plan or such agreement" are. *See id*; *see also Trustees of Minn. Ceramic Tile & Allied Trades Ret. Fund v. Legacy Tile & Marble, Inc.,* Civ. No. 06-2965, 2008 WL 624120, at *6 (D. Minn. Mar. 4, 2008) ("When an employer agrees to make contributions to fringe benefit funds pursuant to a collective bargaining agreement, the terms of that collective bargaining agreement define the employer's obligation to make those payments."); *Cent. States, Se. & Sw. Areas Pension Fund v. Kroger Co.*, 73 F.3d 727, 730-31 (7th Cir. 1996) ("It is the collective bargaining and contribution agreements [that] establish the employer's obligation to the pension fund.") (internal citations omitted). As a result, any defense to a claim under Section 515 must be based on an ambiguity that is apparent from the face of the agreements. *Indep. Fruit*, 919 F.2d at 1349.

Whether a CBA is ambiguous is a question of law. *See id.* Contracts are ambiguous if they are susceptible to more than one reasonable interpretation. *Id.* With respect to the terms of a CBA governed by ERISA, courts apply federal common law rules of contract interpretation. *See Harris v. Epoch Group, L.C.*, 357 F.3d 822 (8th Cir. 2004); *see also Cent. States, Se. & Sw. Areas Pension Fund* v. *Waste Mgmt. of Mich., Inc.*, 674 F.3d 630 (7th Cir. 2012). Words are to be given their plain and ordinary meaning as understood by reasonable, average persons. *Indep. Fruit*, 919 F.2d at 1349.

8

Where language is plain and unambiguous, it cannot be disregarded based on extrinsic evidence. *Excel Corp. v. United Food & Commercial Workers*, 102 F.3d 1464, 1468 (8th Cir. 1996). When determining whether a contract is ambiguous, under federal common law, the court is required to consider the contract as a whole. *See Sheet Metal Workers Intern. Ass'n v. Lozier Corp.*, 255 F.3d 549, 550 (8th Cir. 2001).

In this case, Defendants argue that the plain language of the Agreements exclude Superintendents and General Superintendents from coverage. Defendant points to Schedule 12 of the Agreements which relates to "Wage Rates" and specifies wage rates for Journey Laborers and Apprentices. The Court disagrees for the reasons set forth below.

At the outset, the Court notes that the CBAs[3] are agreements between "[t]he companies signatory to [the] Agreement[s], hereinafter called Employers or contractors"[4] and "[t]he labor organizations on their own behalf and on behalf of the Employees whom they represent and on whose behalf they are recognized or are to be recognized." (Lessard Aff. ¶ 2, Exs. C, D at § 2.) Neither CBA explicitly defines either the term "Employees" or what it means to be "covered by" the Agreement.

---

[3]   The First CBA and the Second CBA are substantially similar, but some language does differ. However, because all of the contributions sought fall within the time period after the Second CBA was signed, the Court's analysis will focus on the Second CBA unless it states otherwise.

[4]   The Agreements also include, "[m]embers of an association who have agreed to be bound to the terms of this Agreement through an Association or other Employers who have done likewise (hereinafter called Employers)." (Lessard Aff. ¶ 2, Exs. C, D.)

9

Despite the lack of definitions, it is clear from the face of the CBAs that they are intended to cover certain types of work and not specific job titles with respect to fringe benefit contributions.  First, the Acceptance Agreement between Insituform and the Union, which, "along with the standard printed CBA . . . together constitute the Agreement between [the parties]," reads:  "[T]his Agreement covers *all work performed* within the scope of the Agreement by all *employees engaged in Laborers' work including but not limited to that work described* in Schedule 12 of the CBA."  (Lessard Aff. ¶ 2, Exs. A & B (emphasis added).)  The plain language of this sentence makes clear that the Agreements between the parties relate to certain *work* being performed.  The language does not limit the scope of the Agreements to specific categories or classifications of employees and instead repeatedly refers to "work."  Schedule 12, referenced in the above-sentence, lists the types of work performed under the Agreements, but is also clear that the listings are "for rate classifications purposes" and "do not constitute an exhaustive list of work performed by Laborers."  (Lessard Aff. ¶ 2, Exs. C & D.)

Second, under Article 22 of the Second CBA which is titled "Fringe Benefits," Defendant must make contributions for and report hours for "all hours worked" by "employees covered by the agreement." (Lessard Aff. ¶ 2, Ex. D.)  Subsection 5(g) of the Agreement unambiguously requires that the "type of work" being performed by employees be tracked and reported:

> Each Employer bound to this Agreement is obligated to maintain adequate records *to identify the type of work being performed by its Employees to allow the Funds to determine whether the Employer is accurately*

10

> *reporting hours to the Funds*.  If the Employer fails to maintain satisfactory records from which the *type of work being performed* by an individual may reasonably be determined, the Employer *will be held liable for all of the hours worked by that individual* for whom the Employer is unable to produce satisfactory records verifying the type of work being performed by that individual.

(*Id*. at § 5(g).)  This entire paragraph would be rendered meaningless if the CBA were read to only apply to employees within certain job classifications.  And, this subsection shows that the unambiguous language of the CBA applies to types of work being performed by employees of Insituform.

Third, Article 22 § 4 specifically states that where employees are "sent to work *outside* the scope of the Agreement," fringe contributions are *not* to be paid.  (*Id*. at § 4.)  Thus, it stands to reason that employees sent to work *inside* the scope of the Agreement would require fringe contributions.  The Agreement unambiguously relates to the work done and not the type of employee doing that work.

Defendants argue that a number of cases stand for the proposition that courts in this circuit would not find that covered work could ever include supervisors.  For example, Defendant argues that because this District has held that supervisors were not employees for purposes of fringe benefit contributions under the CBA in *Legacy Tile*, 2008 WL 624120, even if they performed covered work, Superintendents should be excluded here.  Similarly, Defendant argues that the exclusion of supervisors in *Dugan v. R.J. Corman R.R. Co.*, Civ. No. 00-4114, 2002 WL 1263989 (N.D. Ill. June 5, 2002), shows Superintendents should be excluded from coverage here.  (*See* Doc. No. 35, Def. Br. at 14.)

However, the CBA at issue here is distinguishable on its face from the CBAs examined in the cases cited by Defendant. In *Legacy Tile*, the court did not find that supervisors could never be covered by a CBA. *See Legacy Tile*, 2008 WL 624120, at *5-6. Instead, the court excluded supervisors from coverage on the basis of the specific CBA language, which explicitly delineated "the identity of the individuals performing the work" covered by the CBA with respect to fringe benefits, and explicitly carved out owner-operators in its definition of employees. *Id.* Similarly, the CBAs at issue in *Dugan* also directly excluded supervisors from coverage, and the court explicitly found that "contributions were owed for anyone performing bargaining work, regardless of Union membership, unless they were explicitly excluded from coverage under the CBA." *Dugan*, 2002 WL 1263989, at *3. Conversely, there is no language in the CBA in this case that explicitly excludes supervisors, owners, or anyone else, or specifically identifies the "individuals performing work." The parties to the Agreements at issue here apparently declined to carve out certain classes of workers from the work covered by the Agreements. In fact, on its face, the CBAs in this case contain a broadened definition of the work covered by the Agreements by not limiting its scope to union employees. (Lessard Aff. ¶ 2, Exs. C & D, at § 6(h) (stating that provisions relating to fringe benefits apply "**REGARDLESS OF WHETHER OR NOT SUCH EMPLOYEES ARE MEMBERS OF THE UNION**") (emphasis in original).)

Defendant's arguments regarding *Schnuck Markets, Inc. v. Nat'l Labor Relations Bd.*, 961 F.2d 700 (8th Cir. 1992), fare no better. Defendant argues that the *Schnuck* case supports its position that the Eighth Circuit has held that supervisors cannot be covered

12

by a CBA.  However, the question of fringe benefit payments for work performed by supervisors was not at issue in *Schnuck*.  Instead, the court was presented with the question of whether the plaintiff was covered by the NLRA and could be a member of the bargaining unit when he performed mainly supervisory duties, but also some non-supervisory duties.  *Id.* at 703-06.  In that case, the court held that the plaintiff was a supervisor, that non-supervisory work could not change his status, and that he therefore could not be covered by the NLRA.  *Id.*  *Schnuck* thus stands for the proposition that for purposes of Union representation, a job classification determination cannot be undone when an employee's work includes some work typically done by employees in different job classifications.  *See generally id*.

Here, the parties do not dispute that the five supervisors involved in this case are not union members and should not be represented by the union.  Instead, the question is whether work covered by the CBA merits payment of fringe benefits under Section 515 of ERISA.  The types of employees covered under ERISA may be broader than the types of employees covered by the NLRA, and it is ERISA that governs the specific issue here.  *See Bd. of Trs. of Cement Masons & Plasterers Health v. Whitewater Eng'g Corp.*, 64 Fed. Appx. 39, 41 (9th Cir. 2003) (differing definitions for employee exist "[b]ecause the term 'employee' under [the NLRA] is narrower than the term 'employee' as used for the purposes of determining benefit obligations under [ERISA]."); *see, e.g., Greater Kan. City Laboreres Pension Fund v. Superior Gen. Contractors, Inc.*, 104 F.3d 1050 (8th Cir. 1997) (holding that the court had jurisdiction under ERISA for a Section 515 claim and that the NLRA did not govern).  Union membership is not determinative here, and so

*Schnuck* is inapposite.[5] In fact, it is undisputed that the CBA in this case covers fringe benefits for non-union employees and that the parties have come to an agreement that fringe benefits may be paid for work done by persons outside of the bargaining unit. This is the precise role that supervisors hold in this case—they are employees who perform covered work, but are not union members. Moreover, whether parties ultimately choose to include or exclude certain employees from fringe benefit coverage, courts routinely allow parties to negotiate those terms and make those choices. *See, e.g.*, *Legacy Tile*, 2008 WL 624120. Here, the parties negotiated broad fringe-benefit contribution coverage.[6]

Finally, Defendant argues that the sections in the CBAs relating to job classifications and wage rates (Schedules 12 & 13) show that only "Journey Laborers" and "Apprentices" are covered by the CBAs. The Court disagrees. These sections of the CBAs do not change the provisions relating to fringe benefits. Instead, these sections

---

[5] And, as Plaintiffs note, *Schnuck* involved the court's review of a National Labor Relations Board ("NLRB") decision which distinguishes it from this case. *See generally Schnuck*, 961 F.2d 700.

[6] Defendant argues that requiring fringe benefit contributions for covered work when performed by Superintendents and General Superintendents is an "absurd" position because it would require Superintendents and General Superintendents to have "zero involvement in the very projects for which they are ultimately responsible" and prohibits them from "get[ting] [their] hands dirty." (Doc. No. 51, at 11.) However, should the parties wish to exclude supervisors or to delineate specific categories of employees for which fringe benefit contributions are required, they could do so in their agreements—just as the parties did in those cases cited by Defendant. Again, the Court holds that the unambiguous terms of the CBAs are controlling here.

only outline the *classifications* and corresponding *wage rates* to be applied to work performed under the Agreements.

Thus, looking at the entirety of the CBAs in this case, the Court concludes that the CBAs are unambiguous as a matter of law, and, as a result, the CBAs require contributions for all covered work. Therefore, the Court denies Defendant's motion as to this issue[7] and grants Plaintiffs' motion.

### III. Burden shifting and "Covered Work"

Under ERISA, employers are to maintain employee records that are "sufficient to determine the benefits due or which may become due to such employees." 29 U.S.C. § 1059(a)(1). Also, under the CBAs in this case, Defendant is obligated to maintain records for work performed by its employees. Subsection 5(g) reads as follows:

> Each Employer bound to this Agreement is obligated to maintain adequate records ***to identify the type of work being performed by its Employees to allow the Funds to determine whether the Employer is accurately reporting hours to the Funds***. If the Employer fails to maintain satisfactory records from which the ***type of work being performed*** by an individual may reasonably be determined, the Employer ***will be held liable for all of the hours worked by that individual*** for whom the Employer is unable to produce satisfactory records verifying the type of work being performed by that individual.[8]

---

[7] Defendant argues that if the Court finds that a portion of the relevant employees' work is covered by the Agreements, then it must be for that type of work which was covered by the Agreement. The Court agrees that per the CBA, only certain types of work as described in Schedule 12 (though not exclusively described) is covered. Whether the work at issue is of the type that is covered by the Agreements are for the finder of fact to determine.

[8] The Court notes that the First CBA does not contain this language.

(Lessard Aff. ¶ 2, Ex. D (emphasis added).)  Courts in this District agree that employers should not be able to avoid contribution payment obligations by failing to keep adequate records.  *See Nali v. Maxpro Flooring, LLC*, Civ. No. 09-3625, 2013 WL 673779, at *8 (D. Minn. Feb. 25, 2013); *Seipel v. Arrowhead Indus. Serv. Inc.,* Civ. No. 07-3864, 2010 WL 605722, at *4 (D. Minn. Feb. 11, 2010).  If an employer fails to keep adequate records, and once a plaintiff shows that covered work was performed, the burden shifts to the employer to rebut a presumption that all hours were covered work.  *See Nali*, 2013 WL 673779, at *8; *see also Seipel*, 2010 WL 605722, at *4; *Stanton v. Larry Fowler Trucking Inc.*, 52 F.3d 723, 727-28 (8th Cir. 1995) (adopting burden-shifting principle for inadequate records in context of COBRA and basing that adoption on cases relating specifically to ERISA contributions in the Sixth, Ninth, and Eleventh Circuits).

Here, assuming that the relevant employees' work required fringe benefit contributions,[9] the parties vigorously dispute the amount of that work for which contributions are due.  Plaintiffs contend that they are entitled to summary judgment such that Defendant is obligated to pay for *all* hours worked by the individuals at issue in this case because Defendant did not maintain adequate records, regardless of whether the work was "covered work."  Plaintiffs also argue that because Defendant did not keep contemporaneously accurate records showing the type of work performed and Defendant has provided no expert testimony establishing the precise number of hours worked,

---

[9] Given the Court's analysis above, and the fact that the parties do not dispute that the Superintendents did perform the type of work that is otherwise covered by the CBAs, the Court reiterates its conclusion that covered work was performed during the relevant period for which contributions were due.

Plaintiffs are entitled to use a reasonable approximation or a "just and reasonable inference" that all hours worked by relevant individuals constitute covered work. On the other hand, Defendant argues that if it is owes contributions for these individuals, it cannot be liable for all of the work the employees performed, but instead must be proportional to the amount of work that is actually covered by the Agreement. Defendant also argues that, at the very least, there is a fact question at this stage, and Plaintiffs cannot be granted summary judgment. On the latter point, the Court agrees with Defendant.

Whether Defendant's records are sufficient and accurate is in dispute. Thus, the question of the hours for which Defendant must pay contributions is also in dispute. While it is not in dispute that the Insituform records produced in response to Plaintiffs' audit request do not track the specific types of work performed for the individuals at issue in the case, Defendant *did* produce records showing all hours worked and other relevant employee records as requested by Plaintiffs. Defendant also provided testimony as to the number of hours for which the relevant employees claimed to have performed covered work. As Defendant states, based on the record before the Court, Plaintiffs only reviewed the documents they were provided and developed their bill from those records based on auditor-made assumptions. The Court finds that this is sufficient to create a dispute of material fact as to whether Defendant kept "accurate records" per the Second CBA and the extent to which covered work was performed. Further, the Court declines to determine at this stage that, as a matter of law, Plaintiffs can treat all hours worked by the five employees in this case as covered work. Deeming every hour worked by the five

17

Superintendent employees in this case to be "covered" work cannot constitute a reasonable approximation or a "just and reasonable inference" at the summary judgment phase when the parties agree that the "covered" work actually performed was only a portion of the employees' work. Plaintiffs' motion for summary judgment to the extent that Plaintiffs assert that they are entitled to contributions for all work performed is therefore denied.[10]

## IV.   Additional Audit

The parties dispute whether Plaintiffs are entitled to an additional audit for July 11, 2011 to the present. In its motion, Defendant asserts that Plaintiffs failed to make a proper demand under Article 22 § 5(g) of the CBA and are therefore not entitled to an additional audit. Furthermore, in its opposition to Plaintiffs' motion, Defendant argues that because Plaintiffs fail to mention their claim for an audit in their summary judgment motion, this request should be deemed waived, or should be denied. While Plaintiffs' initially argued that they had in fact made a proper demand, in their reply memorandum (Doc. No. 56), Plaintiffs "now agree that the issuance of an injunction for a new later audit is neither necessary nor appropriate under the facts of this case, in which an audit demand was not refused prior to the commencement of the litigation." (Doc. No. 56, at 3-4.) Given this statement by Plaintiffs, the Court deems moot the issue of whether Plaintiffs properly made a demand and whether summary judgment is appropriate with respect to the audit request.

---

[10]   Because the amount of contributions due is still in dispute, the Court declines to address the question of penalties, costs, and attorney fees at this time.

However, Plaintiffs do now request an order requiring updated records for the audit. The Court finds that this request is appropriate and orders Defendant to produce relevant updated records for the audit, if any exist.

## V.    Defendant's Motions to Strike

Defendant also moves to strike Plaintiffs' Amended Motion for Summary Judgment (Doc. No. 52 (moving to strike Doc. No. 47)) and Plaintiffs' Reply Memorandum in Support of their Motion for Summary Judgment and in Opposition to the Defendant's Motion to Strike (Doc. No. 57 (moving to strike Doc. No. 56)) as untimely. While the Court does not condone untimely filings, given the current nature and status of these pleadings, the Court respectfully denies these motions.

## ORDER

Based upon all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Defendant's Motion for Summary Judgment (Doc. No. [33]) is **DENIED**;

2.    Plaintiffs' Motion for Summary Judgment (Doc. No. [27]) and Amended Motion for Summary Judgment (Doc. No. [47]) are **DENIED IN PART**, and **GRANTED IN PART** as follows:

   a.    With respect to Count I of Plaintiffs' complaint, the Court grants Plaintiff's motion to the extent that it finds that Plaintiffs are entitled to additional contributions as a matter of law. The Court denies the motion to the extent that it finds that Plaintiffs are not entitled to a presumption that all hours worked were "covered" hours;

      b.      With respect to Count II, the Court denies Plaintiffs' motion to the extent that their request for an additional audit is moot; and

      c.      The Court orders Defendant to produce updated records for the audit, to the extent they exist.

3.      Defendants' Motion to Strike (Doc. No. [52]) is **DENIED**; and

4.      Defendants' Motion to Strike (Doc. No. [57]) is **DENIED**.


Dated: February 3, 2014                            s/Donovan W. Frank
                                                          DONOVAN W. FRANK
                                                          United States District Judge